# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| CAROLYN ROYS, | |
| Plaintiff, | No. 16-CV-2046-KEM |
| vs. | **ORDER** |
| UPPER IOWA UNIVERSITY, | |
| Defendant. | |

_____

A few months after becoming sick and taking time off under the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654, Plaintiff Carolyn Roys was fired by her employer, Defendant Upper Iowa University (the University). She initiated this lawsuit, bringing FMLA claims of entitlement (Count I) and discrimination (Count II).[1] The University now moves for summary judgment on both of Roys' claims. Doc. 17. Roys concedes that the University is entitled to summary judgment on her entitlement claim but resists the motion with respect to her discrimination claim. Doc. 24. I grant the motion (Doc. 17). I also deny Roys' related motion to strike (Doc. 27) and deny the University's motion in limine (Doc. 29).

---

[1] The parties refer to these claims as interference and retaliation claims, which is the language many Eighth Circuit cases used before the court clarified the three types of FMLA claims that arise under 29 U.S.C. § 2615(a). *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005-06 (8th Cir. 2012). I use the post-*Pulczinski* language.

## I. BACKGROUND

The following facts are recited in the light most favorable to Roys, the nonmoving party. Roys began working for the University in October 2010. Def. SOF ¶ 1; Pl. Resp. SOF ¶ 1.[2] In October 2014, she was promoted to Director of Academic Success, which was the position she held upon her termination. Def. SOF ¶ 3; Pl. Resp. SOF ¶ 1. When Roys was promoted, her previous position was not replaced, and she kept some of the duties she had held previously—including sending out emails and letters for the Academic Review Committee (ARC) program and serving as the liaison between the University and the Federal Bureau of Investigation (FBI) when the FBI was conducting background checks of students.[3] Def. App. 45. As the Director of Academic Success, Roys also advised students and monitored at-risk students as part of the "Support Our Students" (SOS) program. Def. App. 45, 47-48. At first, Roys was a one-person department, although the previous Director of Academic Success had supervised two employees (one

---

[2] "Def. SOF" refers to Defendant University's Statement of Facts located at Doc. 17-2. "Pl. Resp. SOF" refers to Plaintiff Roys' Response to Defendant University's Statement of Facts located at Doc. 24-1. "Pl. SOF" refers to Plaintiff Roys' Statement of Facts located at Doc. 24-2. "Def. Resp. SOF" refers to Defendant University's Response to Plaintiff Roys' Statement of Facts located at Doc. 25-1. "Def. App." refers to Defendant University's Appendix located at Doc. 17-3, "Def. Supp. App." refers to Defendant University's Supplemental Appendix located at Doc. 25-2, and "Pl. App." refers to Plaintiff Roys' Appendix located at Doc. 24-4.

[3] Roys testified at her deposition, in response to the question "What duties did you continue to have from your [previous] position?," that she "continued to be the liaison for, like, FBI inquiries about . . . background checks for students, if they were applying for jobs, things like that." Def. App. 45. In her affidavit submitted as an exhibit to her resistance for summary judgment, however, she stated that Louise Scott, her boss, "indicated that she would take over the duties of responding to FBI inquiries" upon Roys' promotion, and Roys suggested those duties were "part of [Scott's] position." Pl. App. 85 ¶ 41. Roys cannot create a genuine dispute of material fact for purposes of summary judgment based solely on an affidavit that directly contradicts her earlier, unambiguous deposition testimony. *See Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983).

of which was Roys) who could assist with some of the functions of the position. Pl. App. 34, 76 ¶ 7. Eventually, a retention specialist position was created to give Roys some help with the SOS and ARC programs. Pl. App. 78 ¶ 13. That position was filled by Deena Serra, who worked with Roys for six months before leaving the University in May (prior to Roys taking FMLA leave). Pl. App. 64, 78 ¶¶ 13-14.[4]

Another employee, Jean Merkle, served as co-chair of the SOS program along with Roys. Pl. App. 80 ¶ 22. The SOS program involved an automated system that faculty members or others could use to send an alert when they were concerned about a student. Def. App. 47. Merkle and Roys would receive the alert and notify the SOS committee of the problem. *Id*. The SOS committee would consider the issue, and then one of the committee members would be responsible for reaching out to the student. Pl. App. 76-77 ¶ 8; Def. App. 38, 47.

On May 8, 2015, Roys had surgery on a perirectal abscess that left her temporarily unable to work. Def. SOF ¶¶ 4-5; Pl. Resp. SOF ¶¶ 1-2. On May 21, 2015, she signed a form requesting "[f]ull [d]ay" FMLA leave from May 8, 2015, to an unknown date in the future. Def. App. 97-98. Her FMLA leave was approved on June 4, 2015. *Id*. Denise Ney, the benefits manager for the University, gave Roys a form outlining her FMLA rights, indicating that Roys would be required to use all available paid leave concurrently with leave taken under the FMLA and that she was entitled "to 12 weeks of unpaid leave in a 12-month period calculated as . . . a 'rolling' 12-month period measured backward from the date of any FMLA leave usage."[5] Def. App. 21-22.

---

[4] The parties clarified at oral argument that Serra left before Roys took FMLA leave.

[5] Under this method for calculating the 12-month period for purposes of FMLA leave (authorized by the regulations), "each time an employee takes FMLA leave[,] the remaining leave entitlement would be any balance of the 12 weeks which has not been used during the immediately preceding 12 months." 29 C.F.R. § 825.200(c). Under the "rolling" method, an employee will never be

3

On July 20, 2015, Louise Scott, Roys' boss, sent an email to Roys, reminding her that she would run out of covered time off under the FMLA at the end of the month and instructing her "to have a serious conversation with [her] current [medical] provider as to when [she] can return to work." Pl. App. 54. Shortly thereafter, on July 27, 2015, Roys returned to work. Def. SOF ¶ 7; Pl. Resp. SOF ¶ 1. Ney sent Roys a letter dated August 24, 2015, stating that she "ha[d] exhausted 448 hours of FMLA leave out of a maximum of 480 hours" and that she had "32 hours of FMLA hours to use from now until May 7, 2016." Def. App. 28.

While Roys was on FMLA leave, the vacant retention specialist position previously held by Serra was transferred to another department, and it was "not replaced" in Roys' department. Pl. App. 64, 78 ¶¶ 13-14. The retention specialist position had not been filled as of October 13, 2015. Pl. App. 64. It is not clear whether it was filled at the time of Roys' termination—at oral argument, Roys' counsel stated that he believed it had been filled but pointed to no evidence of that fact, and the University's counsel was unsure. It was planned that the retention specialist, once hired, would still assist Roys with the SOS program, despite working in another department: an email from Roys describes the transfer as a "shift in reporting," and Ney's notes from a meeting with Roys on October 6, 2015, reflect that Roys understood the retention specialist would help with the SOS program once hired. Pl. App. 64; Def. App. 38. The retention specialist would no longer assist Roys with her duties related to the ARC program, however. Pl. App. 65.

An employee in a different department had handled Roys' responsibilities related to the ARC program while she was on FMLA leave, and that employee continued to do

---

entitled to 24 weeks of FMLA leave in a row because employers calculate the FMLA leave period anew "each time that leave is requested." *Id.*

4

so even once Roys returned. Pl. App. 41. When that employee transferred to another department, however, the ARC program became Roys' responsibility once again. *Id.*

After she returned from FMLA leave, Roys continued to miss work intermittently for reasons unrelated to her abscess, and Scott and Ney began keeping track of when Roys was not at the office. Pl. App. 82 ¶ 27. On July 30, 2015, Roys had a doctor's appointment in the morning and arrived to work late. Def. App. 57-58. From August 5 through 8, Roys went on vacation, and later, on August 24, an employee with the payroll office emailed Roys to ask if she had been out for vacation, noting that Roys had no vacation time and that her paycheck would need to be adjusted to reflect unpaid leave. Pl. App. 53. Roys also missed work on August 14, 2015. Def. SOF ¶ 10; Pl. Resp. SOF ¶ 1.

On August 31, 2015, University employees were informed by email of a campus-wide reorganization. Pl. App. 86 ¶ 45. According to Roys, she did not receive the email, and she was not included on the organizational chart. *Id.* As part of the reorganization, which officially took effect on October 1, 2015, Janet Shepherd became Roys' new supervisor. Pl. App. 79 ¶ 17.

During the first half of September, Roys missed three full days and five partial days of work. Def. SOF ¶ 10; Pl. Resp. SOF ¶ 1. On September 22, 2015, Ney sent Roys a letter, asking whether her absences were due to the same serious medical condition as before or a new condition, noting that the University needed to determine whether the absences were entitled to FMLA protection. Def. App. 29. Ney further advised "that as of August 31, 2015, [Roys] ha[d] 32 hours of FMLA time, 8 hours of accrued sick time, and 13.34 hours of accrued vacation time remaining" (Roys accrued 8 hours of sick leave and 13.34 hours of vacation time every month). *Id.*; Pl. SOF; Def. Resp. SOF ¶ 5; Pl. App. 7-8. Because Roys had only one day of paid vacation to cover the three

5

September absences, her paycheck was reduced to reflect two days of unpaid leave. Pl. App. 56.

Also in September, the SOS web form stopped working (faculty used the web form to inform the SOS committee that a student was having problems.). Def. App. 70-71. Merkle and Roys worked with the information technology (IT) department to resolve the problem and manually checked SOS submissions in the meantime. *Id.* Later, on October 4, 2015, a professor emailed Shepherd "a write-up of [his] concerns about" Roys' department, one of which had to do with the problems with the SOS form. Def. App. 89. He also noted that Roys had failed to call him back after he left a voicemail seeking a student's contact information. *Id.*; Def. App. 71.

An email dated September 28, 2015, between Ney and Shepherd, reflects that they were planning to place Roys on a Performance Improvement Plan. Def. Supp. App. 120. On Thursday, October 1, 2015, Roys asked to meet with Shepherd about a few areas of concern. Pl. App. 34. Shepherd responded that she would set up a time sometime in the next week, since she was out of the office the next day. *Id.* On the morning of Monday, October 5, 2015, Roys emailed Shepherd to inform her that her abscess had returned and that she would be working from home because her daughter was sick. Pl. App. 34. The next day, on October 6, Shepherd and Roys met, along with Ney from Human Resources. Def. SOF ¶ 29; Pl. Resp. SOF ¶ 24. Shepherd told Roys that she had not been performing her job duties related to the ARC and SOS programs satisfactorily and that she had thirty days to improve, as outlined in a Performance Improvement Plan. Def. App. 31-32. Specifically, the Performance Improvement Plan stated that Roys needed to notify faculty and the IT department immediately if the SOS web form was not working and imposed a twenty-four hour deadline for Roys to notify faculty and the student's advisor that an SOS submission had been received. Def. App. 31, 38. The Performance Improvement Plan also imposed a forty-eight hour deadline for Roys to send ARC letters

and emails to students and their advisors and stated that Roys was responsible for enlisting help from another department if needed. Def. App. 31. If Roys would be unable to meet these deadlines, she was to let Shepherd know. *Id.* Ney's notes of the meeting reflect that Shepherd also said Roys should email her if she requested help with ARC processing and received no response within twenty-four hours. Def. App. 38. Roys' co-chair of the SOS program, Merkle, was not placed on a Performance Improvement Plan nor subject to any reprimand regarding that program's failings. Pl. App. 80-81 ¶ 22.

On Wednesday, October 7, 2015, ARC letters were ready for Roys to send out, and she missed at least some work that day for a doctor's appointment. Def. App. 92-93. Roys emailed the students on Thursday, October 8, 2015, but she forgot to email the students' advisors. Pl. App. 36. An advisor emailed Roys on Friday, October 9, to ask about the students' ARC status, copying Shepherd on the email. Def. App. 93. Shepherd emailed Roys regarding the students on Monday, October 12, and emailed again on Tuesday, October 13, when Roys did not respond. Def. App. 92. Roys missed work on Monday, October 12, because she was in the emergency room. Pl. App. 36. She also missed some work for doctor's appointments on October 13 and October 23. Def. App. 92, 116.

Ney sent Roys FMLA paperwork on October 6, 2015, after hearing that her abscess had returned. Pl. App. 33-34; Def. SOF ¶¶ 16-17; Pl. Resp. SOF ¶ 1. Roys did not request FMLA leave within the deadline, even though Ney extended the deadline once. Pl. App. 37; Def. SOF ¶ 17; Pl. Resp. SOF ¶ 1. Roys emailed Ney on October 29, 2015, informing her that many of her absences related to other ailments that would not qualify for FMLA leave. Pl. App. 69. Roys' counsel conceded at oral argument that none of Roys' absences upon her return to work in July 2015 were protected by the FMLA. On November 4, 2015, Roys was terminated, purportedly for poor performance—including missing a meeting that had been scheduled for some time, failing

7

to respond to the FBI regarding a student background check within an appropriate timeframe, and failing to send SOS and ARC emails in a timely manner. Def. SOF ¶¶ 3, 36; Pl. Resp. SOF ¶ 1; Def. App. 83-86 ¶¶ 7-8, 17.

The University's employee handbook states that "[d]epending upon the facts, disciplinary action may include oral or written warnings, suspension with or without pay, or immediate termination of employment" and that supervisors "in conjunction with the Director of Human Resources may repeat, modify or omit a level of discipline." Pl. App. 9. Per the employee handbook, written warnings may be given "[w]hen an oral warning fails to achieve the desired improvement in performance or behavior [or] if the supervisor believes the nature of the offense makes its use appropriate." Pl. App. 10. An employee may be terminated as "the result of one serious act of misconduct or insubordination, or as the result of an accumulation of minor offenses, or failure to satisfactorily perform job duties." *Id.* The employee handbook states that "discharges must have the prior approval of the Director of Human Resources and the University President or his/her designee." *Id.*

On May 11, 2016, Roys filed the initial complaint in this lawsuit, and on July 11, 2016, she filed an amended complaint. Docs. 2, 12. The University did not move to dismiss the complaint, and the parties conducted and completed discovery. The University now moves for summary judgment on both Roys' claims. Doc. 17. Roys concedes that the University is entitled to summary judgment on her FMLA entitlement claim (Count I), but she resists the University's motion with respect to her FMLA discrimination claim (Count II). Doc. 24.

In the University's reply brief in support of its motion, it included an affidavit from Dr. William Duffy, the University president, stating that he had approved Roys' termination in November 2015. Def. Supp. App. 122. Roys moved to strike the affidavit under Federal Rule of Civil Procedure 37(c) based on the University's failure to disclose

Dr. Duffy in discovery. Doc. 27. At oral argument, Roys conceded that the motion should not be granted, arguing instead that a genuine issue of material fact exists regarding whether Dr. Duffy approved her termination. I thus will deny the motion to strike (Doc. 27).

## II. DISCUSSION

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." For the plaintiff to avoid summary judgment, sufficient evidence must exist "on which the jury could reasonably find for the plaintiff." *Olmsted v. Saint Paul Pub. Sch.*, 830 F.3d 824, 828 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The court "view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Soo Line R.R. Co. v. Werner Enters.*, 825 F.3d 413, 418 (8th Cir. 2016) (quoting *Bishop v. Glazier*, 723 F.3d 957, 960-61 (8th Cir. 2013)).

The FMLA grants eligible employees the right to take twelve weeks of leave during a twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions" of her position. 29 U.S.C. § 2612(a)(1)(D). Upon return from FMLA leave, the employee is entitled to be restored to her previous position or "to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). An employee is not entitled, however, to "any right, benefit, or position of employment other than [those] to which the employee would have been entitled had the employee not taken the leave." *Id.* § 2614(a)(3)(B).

9

Under 29 U.S.C. § 2615(a)(1), employers are prohibited from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of" FMLA rights. FMLA discrimination claims arise under this subsection when an employer takes an adverse employment action against an employee, "motivated by [the employee's] exercise of FMLA rights." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006-07 (8th Cir. 2012); *see also Brown v. Diversified Distribution Sys., LLC*, 801 F.3d 901, 908 (8th Cir. 2015). Here, the parties agree that Roys exercised her FMLA rights when she took leave in May through July 2015 and that she suffered a materially adverse employment action when the University terminated her employment.[6] They dispute only whether Roys can prove that the University acted with discriminatory intent.

### A. Direct Evidence of Discriminatory Intent

The plaintiff may establish the employer's discriminatory intent through direct evidence. *Brown v. City of Jacksonville*, 711 F.3d 883, 891 (8th Cir. 2013). "[D]irect evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir. 1997)); *see also Massey-Diez v. Univ. of Iowa Cmty. Med. Servs., Inc.*, 826 F.3d 1149, 1160 (8th Cir. 2016). "Direct evidence may be circumstantial if the inferred causal link is strong enough." *Massey-Diez*, 826 F.3d

---

[6] Although Roys alleged in her amended complaint that the adverse employment actions taken against her for taking FMLA leave include transferring the vacant retention specialist position to another department and placing her on the Performance Improvement Plan (Doc. 12 ¶ 27), Roys' counsel clarified at oral argument that the discrimination claim is based only on Roys' termination and waived any reliance on other adverse employment actions to support the discrimination claim.

at 1160. "The bias . . . must be that of the decision maker and must relate to the decisional process." *Id*. "Cases finding direct evidence of discrimination usually involve . . . more blatant" statements and actions, such as use of a racial slur by a supervisor to prove racial discrimination or a statement that more female officers were needed to prove gender discrimination. *Id*. at 1161.

Here, Roys argues that the following constitutes direct evidence of the University's discriminatory intent: (1) Scott emailed Roys while she was on FMLA leave to ask when she would be returning to work; (2) the University did not follow the disciplinary procedure outlined in the employee handbook before terminating Roys; and (3) Roys' co-chair of the SOS program was not put on a Performance Improvement Plan or disciplined in any way regarding that program's failings. Roys' cited evidence of discriminatory intent (discussed in more detail below) is far from rising to the level of direct evidence. *See, e.g., id*. at 1160-61.

### B. *Indirect Evidence of Discriminatory Intent*

In the absence of direct evidence of discrimination, the plaintiff may establish the employer's discriminatory intent by "indirect evidence using the . . . burden-shifting framework" (also applicable to Title VII cases) set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *City of Jacksonville*, 711 F.3d at 891.

> First, the employee must establish a prima facie case of retaliatory discrimination by showing that "she exercised rights afforded by the Act, that she suffered an adverse employment action, and that there was a causal connection between her exercise of rights and the adverse employment action." Second, once the employee establishes a prima facie case, the burden shifts to the employer to article [sic] a legitimate, nondiscriminatory reason for its actions. Finally, the burden shifts back to the employee to demonstrate that the "employer's proffered reason is pretextual."

11

*Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002)).

For purposes of Roys' prima facie case, the parties dispute only whether Roys can establish causation, which requires proof "that an employer's 'retaliatory motive played a part in the adverse employment action.'" *Id.* (quoting *Kipp v. Mo. Highway & Transp. Comm'n.*, 280 F.3d 893, 897 (8th Cir. 2002)). Whether Roys can establish causation is a close call. I will assume, however, that the evidence is sufficient to establish a prima facie case. *See, e.g.*, *Burciaga v. Ravago Ams. LLC*, 791 F.3d 930, 935 (8th Cir. 2015) (assuming without deciding that the plaintiff established a prima facie FMLA case and instead ruling on the basis of pretext); *Phillips v. Mathews*, 547 F.3d 905, 912 n.4 (8th Cir. 2008) (same).

All that the next step requires is that the University produce evidence of a legitimate, nondiscriminatory reason for terminating Roys. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). This step is not an onerous one. *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014). The University points to evidence that it terminated Roys for poor job performance, including failing to send emails for the SOS and ARC programs in a timely manner, missing a meeting, and taking too long to respond to an FBI inquiry about a student. Def. App. 83-86 ¶¶ 7-8, 17. The University has met its burden. *See, e.g.*, *Massey-Diez*, 826 F.3d at 1162 (holding sufficient proffered reason of plaintiff's failure to complete all charting within forty-eight hours as required).

The final step under *McDonnell Douglas* shifts the burden back to Roys to "create[] a question of fact regarding whether [the defendant's] reason was pretextual." *Id.* at 1161. "[Roys'] burden to show pretext 'merges with the ultimate burden of persuading the court that [she was] the victim of intentional discrimination.'" *Torgerson*

*v. City of Rochester*, 643 F.3d 1031, 1046 (8th Cir. 2011) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)); *see also Reeves*, 530 U.S. at 143.

An employee may prove pretext in two ways:

"First, a plaintiff may succeed 'indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Under this method, the employee must rebut the employer's "underlying factual claims" by establishing that the employer's explanation has no basis in fact.

Second, the plaintiff may prove pretext "[]directly by persuading the court that a [prohibited] reason more likely motivated the employer.[]" Under this method, the employee rebuts "the employer's ultimate factual claim regarding the absence of retaliatory intent." The employee must demonstrate "that sufficient evidence of intentional retaliation exists for a jury to believe the plaintiff's allegations and find that the proffered explanation was not the true motivating explanation." Thus, the employee "may concede that the proffered reason for the termination[] *would have been* a sufficient basis for the adverse action while arguing that the employer's proffered reason was not the true reason for the action."

*Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006) (second alteration in original) (citations omitted) (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)). Oft-used evidence of pretext includes "that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies." *Id.* "An employee's attempt to prove pretext . . . requires more substantial evidence [than it takes to make a prima facie case], . . . because . . . evidence of pretext and discrimination is viewed in light of the employer's justification." *Smith*, 302 F.3d at 834 (alteration in original) (quoting *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001)).

Roys does not dispute that she failed to perform her duties for the ARC and SOS programs in a timely manner, nor that she missed a meeting and was slow in responding

13

to an FBI background check, yet still argues that the University's claim that her performance was deficient is not "supported in fact." She argues that her duties related to the ARC and SOS programs were not essential functions of her job and that she was not deficient in other aspects of her work. She also points to a favorable performance review in January 2015 and positive letters of recommendation from three colleagues. Roys acknowledged at her deposition that processing ARC and SOS letters were two of her main priorities. Def. App. 72. The Performance Improvement Plan, put in place on October 6, 2015, also highlighted the importance of Roys timely sending out ARC letters and notified Roys that she would be subject to termination if she did not improve. Def. App. 39-40. The ARC program was an important part of Roys' job, and she did not fulfill her duties related to that program in a timely manner after she returned from FMLA leave at the end of July 2015. That Roys performed other aspects of her job successfully (and received a favorable performance review in January 2015) does not undercut the credibility of the University's explanation for terminating Roys. *See Massey-Diez*, 826 F.3d at 1162.

Roys also argues that several facts, taken together, establish that the University was likely motivated to fire her because she took FMLA leave. She argues that the temporal proximity between her FMLA leave and her termination supports a finding of pretext. "Generally, more than a temporal proximity between protected activity and termination is required" to prove pretext. *Malloy v. U.S. Postal Serv.*, 756 F.3d 1088, 1091 (8th Cir. 2014). To prove causation based on temporal proximity (which is a lower threshold than pretext), "a one-month or two-month lag" between the protected activity and termination "is too long absent other evidence,"*Ebersole*, 758 F.3d at 924-25; but "[a] pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence" needed, *Smith*, 302 F.3d at 832. Roys requested FMLA leave in May 2015, returned from FMLA leave on July 27, 2015, and was terminated more than

14

three months later, on November 4, 2015. Def. App. 97-98; Def. SOF ¶¶ 7, 36; Pl. Resp. SOF ¶ 1. Roys argues that other actions taken by the University help shorten the gap for purposes of temporal proximity: the vacant retention-specialist position was transferred to a different department sometime while Roys was on FMLA leave; Roys was left out of the reorganization chart emailed on August 31, 2015; and she was placed on the Performance Improvement Plan on October 6, 2015. Pl. App. 64, 86 ¶ 45; Def. App. 31-32. Aside from the transfer, all these events occurred more than a month after Roys returned from FMLA leave. The timing of the transfer of the vacant retention-specialist position is unclear, and it may have occurred more than a month after Roys requested FMLA leave. *See Sisk v. Picture People, Inc.*, 669 F.3d 896, 900-01 (8th Cir. 2012) (when evaluating temporal proximity for causation purposes, the "court looks to the date an employer knew of an employee's use (or planned use) of FMLA leave, not the date it ended"; *but see Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1272-73 (11th Cir. 2017) (holding that the relevant date is the last day of an employee's FMLA leave); *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 410 (6th Cir. 2014) (same).

The University contemplated that once the retention-specialist position was filled, that employee would still assist Roys with the SOS program. Pl. App. 64; Def. App. 38. Although the retention specialist would no longer work on the ARC program, an employee from the Provost's office handled the ARC letters when Roys first returned from FMLA leave. Pl. App. 41, 65. When that employee transferred to a different department, however, the ARC letters became Roys' responsibility once again. Pl. App. 41. This evidence rebuts Roys' contention that the University was purposefully setting her up for failure by transferring the vacant retention specialist position to another department, as at the time of Roys' return from FMLA leave, she would have had as much help as before she took leave (with the employee from the Provost's office handling

15

ARC letters, and it planned that the retention specialist, once hired, would assist with the SOS program).

Roys also argues that an email from Scott, her boss, is evidence of the University's discriminatory intent. Scott emailed Roys on July 20, 2015, writing:

> I feel for you as you deal with all your medical issues. As I am sure you are aware, your FMLA is running out at the end of the month. You need to have a serious conversation with your current provider as to when you can return to work. It seems you have so much on your plate, I hope you have someone you can talk with about all that is going on. I know there are resources through HR. You might want to ask about them.

Pl. App. 54. The regulations "permit[] [an employer] to contact [an employee] to inquire about her 'status and intent to return to work.'" *Massey-Diez*, 826 F.3d at 1158 (quoting 29 C.F.R. § 825.311(a)). Although Scott's email can be read as suggesting that Roys would be terminated if she were not able to return to work upon the expiration of her FMLA-protected leave, it does not support that Scott intended to discriminate against Roys upon her return to work for taking FMLA leave.

Roys also argues that her termination did not follow the procedures in the employee handbook. The employee handbook sets out four levels of discipline: oral warning, written warning, suspension, and termination. Pl. App. 9-10. It makes clear that no step is mandatory, stating that "[d]epending upon the facts, disciplinary action may include oral or written warnings, suspension with or without pay, or immediate termination of employment" and that "supervisors in conjunction with the Director of Human Resources may repeat, modify, or omit a level of discipline." *Id.* Thus, the procedures set forth in the employee handbook did not require that Roys receive an oral warning nor be suspended before termination (although she did receive written warning by way of the Performance Improvement Plan). *See Smith*, 302 F.3d at 835 (holding that employer did not deviate from policy in employee handbook when handbook

explicitly stated that employer "reserve[d] the right to immediately discharge associates without progressing through the first three disciplinary steps").

The employee handbook also states that "discharges must have the prior approval of the Director of Human Resources and the University President or his/her designee." Pl. App. 10. Roys argues that her termination violated this provision of the employee handbook. Shepherd's affidavit claims that she made the final decision to terminate Roys, but an affidavit from Dr. Duffy, the University President, states that both he and the Director of Human Resources approved Roys' termination. Def. App. 86 ¶ 19; Def. Supp. App. 122 ¶¶ 2-3. The only evidence Roys cites to support her position that Dr. Duffy did not approve her termination is that the University did not identify Dr. Duffy in response to an interrogatory requesting the names "of all individuals involved in any manner" in her termination. Doc. 27-3, at 3. I doubt that this evidence is sufficient to rebut Dr. Duffy's affidavit and create a genuine issue of material fact regarding his approval. Even if Dr. Duffy failed to approve Roys' termination, however, this would be very weak evidence of pretext, as no evidence demonstrates that the handbook was routinely followed with Dr. Duffy approving terminations. *See Smith*, 302 F.3d at 835 (noting that the plaintiff "pointed to no other employees who were treated differently [than plaintiff] under the progressive discipline policy" set forth in the employee handbook).

Roys further argues that pretext can be established because Merkle, the co-chair of the SOS program, was not placed on a Performance Improvement Plan nor reprimanded for that program's failings.

> In proving pretext by showing that similarly situated employees were treated more leniently, the plaintiff's "comparators" must be "similarly situated in all relevant respects." The comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing

17

circumstances." The comparators need not have committed the exact same offense but must have engaged in conduct "of comparable seriousness." *Ebersole*, 758 F.3d at 926 (citations omitted) (quoting *Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1229-31 (8th Cir. 2013)). The only evidence that Merkle was a similarly situated employee is that she co-chaired the SOS program with Roys. Roys was placed on a Performance Improvement Plan and ultimately terminated for a number of deficiencies in her job performance, only some of which related to the SOS program. Def. App. 31, 83-84. There is no evidence that Merkle had deficiencies in other areas of her work aside from the SOS program. In addition, no evidence establishes that Merkle had the same supervisor as Roys. It is also unclear whether Merkle was dilatory in performing her SOS duties or that she had the same level of responsibility over the SOS program as Roys. Even assuming that she did, sufficient distinguishing circumstances exist such that Merkle is not a valid comparator for purposes of establishing pretext.

Roys makes much of the fact that the ARC duties were not included in her official job description until October 13, 2015, and then removed two days after her termination. Roys neglects to mention that in her written response to the Performance Improvement Plan (which she drafted on October 13, 2015, but did not send until October 29, 2015), she complained, "my job description was . . . not updated to reflect my job duties . . . even though I did request this to be done shortly after I began in this position." Pl. App. 36, 43. It seems likely that Roys' job description was updated at her request. Even assuming it was not, there is no dispute that the ARC program was one of Roys' main responsibilities. Def. App. 72. At best, this is weak evidence of pretext.

Finally, Roys argues that she absented work upon her return from FMLA leave with the same frequency as before she took leave and that the University began tracking her absences upon her return. An employer placing an employee "under constant

surveillance at work" may help prove pretext, along with other evidence. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1052, 1061 (8th Cir. 1997) (addressing Title VII retaliation claim). In *Kim*, such other evidence included:

> [the employee's] Saturday and fill-in shipping foreman duties were immediately eliminated, he began to receive markedly lower performance evaluations, he was orally cautioned about a poor attitude toward management, he was . . . excluded from meetings at work, he was disciplined following a September 1992 incident . . . , and in late 1993 he was required to participate in special remedial training.

*Id*. at 1061. The additional evidence here, discussed previously, does not rise to the level of the additional evidence in *Kim*. Moreover, here, Roys used all her sick leave and vacation time while on FMLA leave, yet continued to miss work upon her return, and the University needed to know how much unpaid leave Roys was taking so that her paycheck could be adjusted accordingly. Pl. App. 53; Def. App. 29, 57-58; Def. SOF ¶ 10; Pl. Resp. SOF ¶ 1. That Roys' return from FMLA leave coincides with her need to take unpaid leave undercuts the significance of the timing of the University beginning to track Roys. *See Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1001 (8th Cir. 2011) ("[T]emporal proximity[] is undermined where the allegedly retaliatory motive coincides temporally with the non-retaliatory motive.").

Roys' argument that she missed work as frequently as before also misses the mark. Roys' absences after she returned from leave impacted her performance, and no evidence establishes that her performance was so affected by absences before she took FMLA leave. For example, Roys was placed on the Performance Improvement Plan on October 6, 2015, which set forth a 48-hour deadline to send out ARC letters and emails. Def. App. 31. If Roys did not think she would be able to meet these deadlines, she was to notify Shepherd. *Id*. On Wednesday, October 7, ARC letters were ready for Roys to send out, and she missed at least some work that day for a doctor's appointment. Def. App. 92-93, 117. On Friday, October 9, a student advisor emailed both Roys and

19

Shepherd asking about the status of the ARC letters and noting that students had been inquiring. Def. App. 93. On Monday, October 12, Shepherd emailed Roys to ask whether she had sent the ARC letters. Def. App. 92. Roys missed work that day because she was in the emergency room and did not respond to Shepherd's email. Pl. App. 35-36; Def. App. 92. Shepherd again emailed Roys on Tuesday, October 13. Def. App. 92. Roys finally responded, stating that she had sent the ARC letters to students on Thursday, October 8; but that she had neglected to send letters to the students' advisor as required. Pl. App. 36. She apologized that "medical issues are taking up some of my time" and noted that she had another doctor's appointment that afternoon. *Id*. In that instance, Roys missed work, failed to send out all the necessary letters for the ARC program in a timely manner, and failed to keep Shepherd informed (as the Performance Improvement Plan required her to do).

The facts here, considered in combination, are far from rising to the level of evidence necessary to rebut the University's stated reason for terminating Roys and establish that the University was likely motivated by a discriminatory motive. *See, e.g., Massey-Diez*, 826 F.3d at 1162-64. Roys cannot establish pretext, so the University is entitled to summary judgment on Roys' discrimination claim.

### III. CONCLUSION

Roys' motion to strike (Doc. 27) is **denied**, and the University's motion for summary judgment (Doc. 17) is **granted**. Judgment should be entered in favor of the University. The University's motion in limine (Doc. 29) is **denied** as moot.

**IT IS SO ORDERED** this 17th day of August, 2017.

_Kelly K.E. Mahoney_
Kelly K.E. Mahoney
United States Magistrate Judge
Northern District of Iowa

20